**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Micah Cuppy,<br><br>Plaintiff,<br><br>vs.<br><br>KBR, Inc.,<br><br>Defendant. | C/A No.:<br><br>**COMPLAINT**<br>(Jury Trial Requested) |

Plaintiff Micah Cuppy ("Plaintiff"), by and through undersigned counsel, brings this Complaint against Defendant KBR, Inc. ("KBR" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for unpaid overtime wages, interference with and retaliation for the exercise of family and medical leave rights, retaliation for protected activity in furtherance of a False Claims Act action, and unpaid wages under South Carolina law. Mr. Cuppy was a long-tenured, award-winning KBR employee who, for the better part of a year, simultaneously performed the duties of his own position as a Senior System Support Specialist and the duties of a separate, vacant PowerApps/Database Administrator position, which was work that KBR billed its United States Army customer while paying Mr. Cuppy only at his lower Systems Support Specialist rate and refusing to pay him for the overtime he worked.

2. Mr. Cuppy suffers from diagnosed depression and anxiety and was entitled to intermittent leave under the Family and Medical Leave Act. KBR management discouraged and interfered with his use of approved intermittent leave. After Mr. Cuppy

raised concerns that KBR was billing the Army for two staffed positions while only one person (Mr. Cuppy) was performing the work, KBR refused to even interview him when the PowerApps/Database Administrator position was formally posted, subjected him to a series of pretextual disciplinary actions, and constructively forced his resignation.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, including the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"); the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); and the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h).

4. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

5. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendant conducts business and Plaintiff performed his work in this District at the Army Prepositioned Stocks-3 ("APS-3") site located at 103 Guidance Road, Goose Creek, Berkeley County, South Carolina.

## PARTIES

6. Plaintiff Micah Cuppy is a citizen and resident of the State of South Carolina. At all relevant times, Mr. Cuppy was employed by KBR as a Senior Systems Support Specialist and MIS Lead at the APS-3 site in Goose Creek, South Carolina.

7. Defendant KBR, Inc. ("KBR") is a government-services contractor that performs work for the United States Army under the APS-3 contract and maintains a place of business at 103 Guidance Road, Goose Creek, South Carolina 29445. At all relevant times, KBR was Plaintiff's "employer" within the meaning of the FLSA, the FMLA, and the South Carolina Payment of Wages Act.

8. At all relevant times, KBR was an "enterprise engaged in commerce" with annual gross volume of business well in excess of $500,000, and Plaintiff was an employee "engaged in commerce" within the meaning of the FLSA. KBR employed 50 or more employees within 75 miles of Plaintiff's worksite, and Plaintiff was an "eligible employee" and KBR a "covered employer" within the meaning of the FMLA.

## FACTUAL ALLEGATIONS

### *A. Mr. Cuppy's Employment and Recognized Performance*

9. KBR employed Mr. Cuppy for nearly four years.

10. Mr. Cuppy worked for KBR through a staffing agency for approximately two years before KBR hired Mr. Cuppy.

11. Mr. Cuppy held the position of Senior Systems Support Specialist and served as the MIS Lead for the APS-3 program supporting the United States Army at Goose Creek, South Carolina.

10. Mr. Cuppy was a highly regarded employee.

11. KBR repeatedly recognized his contributions, including:

a. a July 2, 2024 Certificate of Appreciation for leading the MIS team's transition of all files and databases from a legacy file server to a new shared-drive system;

b. a Q3 2025 OneKBR Award; and

c. a November 6, 2025 certificate recognizing his "exceptional efforts" and "the development of critical databases on the customer's server."

***B. KBR Requires Mr. Cuppy to Perform Two Positions' Duties***

11. KBR employed a separate, dedicated Database Administrator, Christopher "Bailey" Weschler.

12. On or about May 9, 2025, Mr. Weschler gave notice of his resignation, with a last day of May 23, 2025.

13. KBR did not backfill the Database Administrator position before March 2026.

12. Following the vacancy, and in the face of the Army customer's software-license expiration and a system migration ("AUDS"), KBR directed and permitted Mr. Cuppy to perform the duties of the vacant PowerApps/Database Administrator position in addition to his own full-time duties as a Senior Systems Support Specialist.

13. Mr. Cuppy taught himself PowerApps and developed eight new programs, including the highly visible USG COR Purchase Request Database, a critical procurement tool used directly by Army Sustainment Command and Army Contracting Command.

14. As KBR's own award citation acknowledged, this work was performed "[i]n the absence of the KBR Database Administrator position."

14. KBR management was fully aware that Mr. Cuppy was performing the duties of both positions.

15. In a July 3, 2025 email exchange, KBR's Deputy Program Manager Keith Weber and Business Manager Park Paige discussed which job code best described the database and application-development work Mr. Cuppy was performing, confirming that Mr. Cuppy was doing work classified above and beyond his Systems Support Specialist role.

15. Despite knowingly receiving the benefit of Mr. Cuppy's work in both roles, KBR continued to compensate Mr. Cuppy only at his lower Senior Systems Support Specialist rate and failed to pay him for the overtime hours he worked to satisfy the demands of both positions.

***C. KBR's Billing of the Army for a Vacant, Separately Priced Labor Category***

16. The APS-3 contract is a labor-hour/cost-type government contract under which KBR staffs defined positions mapped to specific KBR labor categories (job codes) and bills the Army for labor hours worked within each category.

17. Different labor categories carry different qualification requirements and different billing rates.

17. Mr. Cuppy's assigned labor category was that of a Senior Systems Support Specialist (Management Information Systems, or "MIS").

18. The database-administration and PowerApps application-development work he was directed to perform corresponded to a separate, higher-skilled labor category.

19. In a July 3, 2025 email exchange, KBR's Deputy Program Manager Keith Weber circulated competing job descriptions, specifically KBR Job Code SIBP20 (IT Business Process Analyst) and KBR Job Code SIAD20 (IT Applications Developer), and asked which "job description best applies" to the database-update work Mr. Cuppy was performing.

20. Mr. Cuppy and Business Manager Park Paige agreed the work fell under SIAD20, IT Applications Developer.

21. The PowerApps/Database Administrator work was a distinct labor category separate from, and above, Mr. Cuppy's Systems Support Specialist category.

18. That labor category had a dedicated incumbent, Database Administrator Christopher "Bailey" Weschler, until his resignation effective May 23, 2025.

19. After the position went vacant, KBR did not backfill it.

20. However, the contractual requirement to perform the database-administration/application-development function did not disappear.

21. Instead, KBR directed Mr. Cuppy to perform that vacant category's work.

22. However, Mr. Cuppy remained classified and paid within the lower Systems Support Specialist category.

19. Upon information and belief, KBR continued to represent to its Army customer that the database-administration/PowerApps function (SIAD20) was being staffed and performed as required under the contract.

20. The above stated representations were made through CDRLs (Contract Data Requirements Lists), staffing submissions, labor-category assignments, personnel

qualifications, vacancy reports, contract-performance reports, task-order reports, and monthly invoices.

21. KBR billed the Army for labor associated with the database-administration/PowerApps function (SIAD20) function.

20. However, it was only Mr. Cuppy who was performing the work of both labor categories.

21. KBR thereby obtained the benefit of billing the Army for a staffed, higher-skilled labor category while simultaneously suppressing its own labor costs by paying Mr. Cuppy only at the lower Systems Support Specialist rate and refusing to pay him overtime for the additional work.

22. KBR's own Q3 2025 OneKBR Award citation states that Mr. Cuppy performed this work "[i]n the absence of the KBR Database Administrator position."

23. The Q3 2025 OneKBR Award confirms that the separately billed function was, in fact, vacant and being covered by Mr. Cuppy.

21. The gap between what KBR represented and billed (a staffed database-administration/application-development labor category) and what KBR actually delivered (a single Systems Support Specialist covering two functions) was material to the Army's payment decisions.

22. This conduct, which was presenting or causing to be presented false or fraudulent claims for payment to the United States, and making or using false records or statements material to those claims and to KBR's obligation to properly staff and bill the contract, is actionable under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)–(B).

22. On multiple occasions, Mr. Cuppy raised questions internally to his supervisor Christopher Lee and manager Park Paige about both positions being billed to the Army customer while he alone performed the work.

23. On multiple occasions, Mr. Cuppy raised questions internally to his supervisor Christopher Lee and manager Park Paige about the propriety of KBR representing that the vacant labor category was staffed.

24. His August 13, 2025 written communication further documented that PowerApps development fell "outside the scope of [his] current role," and urged KBR to hire a "dedicated PowerApps developer."

25. The August 23, 2025 communication placed KBR on notice of the staffing and billing discrepancy.

***D. Mr. Cuppy's Disability, FMLA Rights, and KBR's Interference***

23. Mr. Cuppy has been diagnosed with depression and anxiety, which are serious health conditions within the meaning of the FMLA.

24. The workload of performing two positions with minimal support significantly exacerbated those conditions.

24. On August 13, 2025, Mr. Cuppy notified his manager, Park Paige, and his supervisor, Chris Lee, in writing that PowerApps development fell outside the scope of his role, that the additional development work with minimal support had "significantly impacted [his] mental health," that he had been diagnosed with depression and anxiety, and that he "may need to take FMLA days to recover and refocus."

25. This communication placed KBR on notice of Mr. Cuppy's serious health condition and his intent to exercise FMLA rights.

25. Mr. Cuppy was entitled to intermittent FMLA leave.

26. He struggled to use needed intermittent leave because he feared falling further behind given his excessive dual-role workload.

26. KBR management and Human Resources personnel were aware that (a) Mr. Cuppy was performing the duties of the vacant position, (b) his workload had become excessive, and (c) he was struggling to use his approved intermittent FMLA leave.

27. KBR management personnel repeatedly made comments discouraging and minimizing his use of approved intermittent FMLA leave, including by suggesting that taking leave would only cause him to become more overwhelmed or fall further behind in his work.

***E. KBR's Refusal to Interview Mr. Cuppy and Pretextual Discipline***

27. After Mr. Cuppy performed significant PowerApps and database-administration duties for months, developed applications relied upon by KBR, received recognition and an award for that work, and helped KBR satisfy its contractual obligations to the Army while the position remained vacant, Mr. Cuppy applied for the PowerApps/Database Administrator position once it was officially posted.

28. KBR failed to grant Mr. Cuppy an interview when the PowerApps/Database Administrator position was officially posted.

28. Upon information and belief, KBR's refusal to interview or select Mr. Cuppy was related to the questions he raised about both positions being billed to the Army customer, and to his exercise of FMLA rights.

29. KBR also subjected Mr. Cuppy to a series of disciplinary "counseling notices," including a May 1, 2026 written counseling concerning accountability of government property.

30. Upon information and belief, these actions were pretextual and were issued in retaliation for Mr. Cuppy's protected activity and his exercise of FMLA rights.

***F. Constructive Discharge***

30. The cumulative effect of KBR's conduct, requiring Mr. Cuppy to perform two positions without appropriate pay or overtime, discouraging his use of FMLA leave, refusing to interview him for the position whose duties he was already performing, and subjecting him to pretextual discipline, rendered his working conditions so intolerable that a reasonable person in his position would have felt compelled to resign.

31. On or about April 3, 2026, Mr. Cuppy submitted his resignation, effective May 11, 2026.

32. In his contemporaneous exit interview, Mr. Cuppy identified his dissatisfaction with leadership and the lack of support from management and noted that he had repeatedly requested overtime support for performing two different positions and had not received it.

## FOR A FIRST CAUSE OF ACTION
**(Violation of the Fair Labor Standards Act, 29 U.S.C. section 201 et seq.)**

33. Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

34. At all relevant times, Plaintiff was a non-exempt employee entitled to overtime compensation under the FLSA.

35. At all relevant times, Defendant was an employer subject to the FLSA.

36. The FLSA requires that a covered, non-exempt employee be compensated at a rate of not less than one and one-half times his regular rate of pay for all hours worked in excess of forty (40) in a workweek. 29 U.S.C. § 207(a).

37. Plaintiff regularly worked in excess of forty hours per week in order to perform the combined duties of his Senior Systems Support Specialist position and the vacant PowerApps/Database Administrator position.

38. Defendant knew Plaintiff was performing overtime work, benefited from that work, and billed its Army customer for labor associated with that work, yet failed to pay Plaintiff the overtime compensation owed.

39. Defendant knew, or showed reckless disregard for whether, its conduct violated the FLSA.

40. Defendant's failure to pay overtime compensation was willful within the meaning of 29 U.S.C. § 255(a), entitling Plaintiff to a three-year limitations period.

41. As a direct and proximate result of Defendant's violations, Plaintiff is entitled to recover his unpaid overtime wages, an equal amount as liquidated damages, prejudgment interest, and reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## FOR A SECOND CAUSE OF ACTION
**(Interference with FMLA Rights, Family and Medical Leave Act, 29 U.S.C. section 2615(a)(1))**

42. Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

43. At all relevant times, Plaintiff was an eligible employee.

44. At all relevant times, Defendant was a covered employer.

45. At all relevant times, Plaintiff was entitled to leave under the FMLA on account of his serious health conditions of depression and anxiety.

46. Plaintiff gave Defendant sufficient notice of his need for FMLA leave, including his written August 13, 2025 communication referencing his diagnoses and his need to take FMLA days.

47. It is unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the FMLA. 29 U.S.C. § 2615(a)(1).

48. Defendant interfered with Plaintiff's exercise of his FMLA rights by, among other things, (a) discouraging and minimizing his use of approved intermittent leave, (b) suggesting that taking leave would only cause him to fall further behind, and (c) maintaining an excessive dual-role workload that chilled and effectively denied his ability to use the intermittent leave to which he was entitled.

49. As a direct and proximate result of Defendant's interference, Plaintiff has suffered damages, including lost wages, salary, benefits, and other compensation, and is entitled to those damages, liquidated damages, equitable relief, and reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 2617.

## FOR A THIRD CAUSE OF ACTION

**(Retaliation for Exercise of FMLA Rights – Family and Medical Leave Act, 29 U.S.C. section 2615(a)(2))**

50. Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

51. Plaintiff engaged in protected activity under the FMLA by notifying Defendant of his serious health conditions and his need for, and intent to use, intermittent FMLA leave.

52. It is unlawful for an employer to discharge or in any other manner discriminate against an employee for opposing any practice made unlawful by the FMLA or for exercising FMLA rights. 29 U.S.C. § 2615(a)(2).

53. Following and because of Plaintiff's protected activity, Defendant took adverse employment actions against him, including (a) refusing to interview or select him for the PowerApps/Database Administrator position, (b) subjecting him to pretextual discipline, and (c) creating intolerable working conditions that resulted in his constructive discharge.

54. A causal connection exists between Plaintiff's protected activity and the adverse actions taken against him. Defendant's stated reasons for its actions are pretextual.

55. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered damages and is entitled to lost wages and benefits, liquidated damages, equitable relief including reinstatement or front pay, and reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 2617.

**FOR A FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the False Claims Act, 31 U.S.C. section 3730(h))**

56. Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

57. The False Claims Act prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because of lawful acts done to stop one or more violations of the FCA. 31 U.S.C. § 3730(h).

58. Plaintiff engaged in protected activity when he raised concerns and questions internally, including to his supervisor Chris Lee and manager Park Paige, about KBR representing to and billing the Army customer for a staffed, separately priced database-administration/application-development labor category (KBR Job Code SIAD20, IT Applications Developer) that had been vacant since the Database Administrator's resignation on May 23, 2025, when in truth only Plaintiff, classified and paid within the lower Systems Support Specialist category, was performing that work.

59. Presenting or causing to be presented false or fraudulent claims for payment and making or using false records and statements material to those claims and to its contractual staffing obligations are False Claims Act violations.

60. Plaintiff's internal complaints regarding the dual-position billing, his August 13, 2025 written communication that PowerApps development fell outside his role and that KBR should hire a dedicated PowerApps developer, and his repeated questions about labor-category staffing and billing were undertaken in a good-faith and objectively reasonable belief that KBR was committing violations of the False Claims Act, and constituted efforts to stop one or more such violations.

61. Defendant knew of Plaintiff's protected activity.

62. Because of that protected activity, Defendant retaliated against Plaintiff by refusing to interview or select him for the position whose duties he performed, subjecting him to pretextual discipline, and creating intolerable working conditions resulting in his constructive discharge.

63. As a direct and proximate result of Defendant's retaliation, Plaintiff is entitled to all relief necessary to make him whole under 31 U.S.C. § 3730(h)(2), including

reinstatement with the same seniority status, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained, including litigation costs and reasonable attorneys' fees.

**FOR A FIFTH CAUSE OF ACTION**
**(Violation of the South Carolina Payment of Wages Act (SCPWA))**

64. Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

65. The South Carolina Payment of Wages Act ("SCPWA") requires an employer to pay all wages due to an employee.

66. The South Carolina Payment of Wages Act ("SCPWA") defines "wages" to include all amounts due for labor or services rendered, whether calculated by time, task, piece, or commission.

67. Defendant is an "employer," as defined by the SCPWA, Section 41-10-10(1).

68. Plaintiff performed labor and services for Defendant.

69. That labor and those services by Plaintiff for Defendant included the duties of the vacant PowerApps/Database Administrator position and substantial overtime work.

70. Defendant agreed or was otherwise obligated to compensate Plaintiff for the above-stated services.

71. That compensation constituted "wages" within the meaning of the SCPWA.

72. Defendant failed and refused to pay Plaintiff all wages due for the work he performed.

73. Plaintiff has put Defendant on notice of the wages due and provided opportunity for payment.

74. Defendant's failure to pay Plaintiff all wages due is willful, without justification, and in violation of the duty of good faith and fair dealing.

75. Pursuant to Section 41-10-80(C), Plaintiff is entitled to recover three times the amount of his unpaid wages, attorney's fees, and costs.

**FOR A SIXTH CAUSE OF ACTION**
**(Constructive Discharge in connection with Counts 1-5)**

76. Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77. Through its deliberate and unlawful conduct, Defendant rendered Plaintiff's working conditions so difficult, unpleasant, and intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign.

78. That conduct included, without limitation:

a. requiring Plaintiff to perform the duties of two full-time labor categories simultaneously without appropriate pay or overtime;

b. refusing to pay him for substantial overtime worked;

c. discouraging, minimizing, and effectively denying his use of approved intermittent FMLA leave for his serious health conditions;

d. refusing even to interview him for the PowerApps/Database Administrator position whose duties he was already performing and for which he had been recognized and awarded; and

e. subjecting him to a series of pretextual disciplinary counseling notices.

79. KBR undertook this course of conduct because of Plaintiff's protected activity under the FLSA, the FMLA, and the False Claims Act, and it was reasonably foreseeable that such conduct would compel Plaintiff's resignation.

80. On or about April 3, 2026, with a resignation effective May 11, 2026, Plaintiff was constructively discharged.

81. His contemporaneous exit interview confirmed that he left because of dissatisfaction with leadership and the lack of support from management, and because he had repeatedly requested support for performing two different positions without receiving it.

82. Plaintiff's constructive discharge constitutes an adverse employment action for purposes of his retaliation claims under Counts II, III, and IV, and for his wage claims under Counts I and V.

83. As a direct and proximate result of his constructive discharge, Plaintiff has suffered lost wages, benefits, and other compensation, and is entitled to all corresponding legal and equitable relief available under those Counts, including back pay, front pay or reinstatement, and other make-whole relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and award the following relief:

a. Unpaid overtime compensation under the FLSA, together with an equal amount in liquidated damages, pursuant to 29 U.S.C. § 216(b);
b. All damages available under the FMLA, including lost wages, salary, employment benefits, and other compensation; liquidated damages; and equitable relief including reinstatement or front pay, pursuant to 29 U.S.C. § 2617;
c. All relief available under 31 U.S.C. § 3730(h), including reinstatement with the same seniority status Plaintiff would have had but for the retaliation, two times the

amount of back pay, interest on the back pay, and compensation for special damages, including litigation costs;

d. Treble the amount of unpaid wages, together with costs, under the South Carolina Payment of Wages Act, S.C. Code Ann. § 41-10-80(C);

e. Prejudgment and post-judgment interest as allowed by law;

f. Reasonable attorneys' fees and costs of this action; and

g. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

s/Johanna C. Valenzuela
Johanna C. Valenzuela (Fed Bar No. 11130)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, Second Floor (29201)
PO Box 1929
Columbia, South Carolina 29202
T: 803.904.7919
F: 803.904.7910
jvalenzuela@burnetteshutt.law

**ATTORNEY FOR PLAINTIFF**

Columbia, South Carolina

September 3, 2026